UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DANIEL MIRANDA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. SECURITY ASSOCIATES, INC.,<br><br>Defendant. | Case No. 18-CV-00734-LHK<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 68 |

Plaintiffs Daniel Miranda ("Miranda") and Landmark Protection, Inc. ("Landmark") (collectively, "Plaintiffs") bring the instant contract-related lawsuit against Defendant U.S. Security Associates, Inc. ("Defendant" or "USSA"). Before the Court is USSA's motion for summary judgment. ECF No. 68. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court DENIES USSA's motion for summary judgment.

## I.      BACKGROUND

### A.  Factual Background

Plaintiff Daniel Miranda was the former owner and chief executive officer of Landmark Protection, Inc. ("Landmark"), a provider of security services. ECF No. 69-1 ("Miranda Decl.") at ¶¶ 1-2. In June 2016, Miranda was contacted by Richard Wyckoff, the chief executive officer of

USSA, which is a nationwide security company and Landmark's competitor. *Id.* at ¶ 4. Wyckoff contacted Miranda to discuss acquiring Landmark's assets and hiring Miranda as a senior executive at USSA. *Id.* Interested in Wyckoff's offer, Miranda and his attorney, over the course of the next 3 months, negotiated the purchase with John Harford, chief development officer at USSA. *Id.* at ¶ 5. Around September 2016, Miranda and USSA executed 2 contracts, one hiring Miranda as senior vice president of strategic development and innovation at USSA, and the other executing the sale of Landmark to USSA in the form of an asset purchase agreement. ECF No. 70, Ex. 2 (asset purchase agreement, or "APA") at 1; ECF No. 70, Ex. 3 ("Employment Agreement") at 9.

The APA structured the purchase such that USSA would acquire Landmark for an upfront cash payment of $1.375 million. ECF No. 68-2, Ex. 1 (Harford Dep.) at 63:25-64:5. In addition, the APA allowed for 3 "earn-out payments" to be made on each of the first 3 anniversaries of the APA's execution. APA at 4. The earn-out payments were calculated in accordance with a formula irrelevant to the instant case, but the aggregate amount of the 3 earn-out payments was capped at $625,000. APA at 1-3. In order to earn each of the earn-out payments, the Landmark business had to earn an annual EBITDA (earnings before interest, taxes, depreciation, and amortization) of at least $500,000. *Id.* According to the APA, if Landmark was eligible for a earn-out payment in a given year, the earn-out payment would be made to Landmark. *Id.* at 4-5. Also according to the APA, the EBITDA was to be "determined in accordance with Buyer's historical reporting policies. *Id.* Buyer is defined as USSA. *Id.*

The executed Employment Agreement was structured such that Miranda was entitled to terminate his employment for "Good Reason," defined as USSA's material breach of the Employment Agreement. Employment Agreement at 1. The Employment Agreement also mandated the payment of a severance package if Miranda resigned for Good Reason. *Id.* at 3. However, payment of the severance package was conditioned on Miranda "executing a general release of any and all claims [Miranda] may have against [USSA] at the time of [Miranda's] termination." *Id.*

After the APA and the Employment Agreement were executed, Miranda joined USSA as

of September 2016. Miranda Decl. at ¶ 17. Landmark was incorporated into USSA as branch 224. *Id.* at ¶ 19. However, Miranda notes that during the first year of his employment at USSA, he believed that "USSA was grossly neglecting Landmark's business." *Id.* at ¶ 22. USSA "spent no money on marketing, sales, or business development." *Id.* In order to keep track of Landmark's business, Miranda asked for, and received, monthly profit and loss reports for branch 224 (Landmark). *Id.* at ¶ 20. Miranda asserts that these profit and loss reports "included a bottom-line calculation of EBITDA for each branch. [Miranda] thus concluded that these reports would be used to determine whether Landmark had surpassed the $500,000 EBITDA threshold for an earn-out payment." *Id.*

In September 2017, after a year's employment at USSA, Miranda asked for a first year profit and loss report for Landmark. *Id.* at ¶ 25. The report "showed that Landmark's EBITDA had just passed the $500,000 EBITDA threshold to qualify . . . for an earn-out payment." *Id.* Miranda "immediately forwarded the report to [John] Harford," USSA's chief development officer, and "informed [Harford] that the first-year earn-out payment has been earned." Miranda Decl. at ¶ 26. Harford responded by stating that he would "verify the numbers with the accounting department" and then respond to Miranda. *Id.* However, Miranda never heard from Harford again on this topic.

Miranda did not receive any other communication from USSA regarding the earn-out payment until October 16, 2017. *Id.* at ¶ 27. On October 16, 2017, Miranda received an email from USSA's general counsel informing Miranda that USSA calculated Landmark's first-year EBITDA to be $384,599, falling far short of the $500,000 required for an earn-out payment. *Id.* at ¶ 27. USSA's general counsel also attached a spreadsheet to the email showing how USSA calculated the EBITDA. *Id.* at ¶ 28. Miranda reviewed the spreadsheet and "discovered that USSA had applied a number of deductions from the branch 224 EBITDA that branch 224 had not actually incurred. These included small expenses such as 'office supplies,' 'utilities,' and 'postage and delivery,' which had not actually been incurred. *Id.* Miranda also noted a deduction of $125,000 for "owner salary" despite the fact that Miranda was no longer the owner of Landmark and did not draw a salary from Landmark. *Id.* Between October 2017 and January 2018, Miranda's attorney

3

attempted to have USSA cure its apparent breach of the APA to no avail. *Id.* at ¶ 29.

In January 2018, Miranda gave notice that he would be resigning from USSA effective January 29, 2018. *Id.* at ¶ 30. Miranda claims that he resigned for "Good Reason" under the Employment Agreement "on the ground that USSA had failed to compensate [Miranda] as it was required to do under the APA." *Id.* USSA's chief human resources officer responded to Miranda on January 17, 2018, and disputed Miranda's claims, but confirmed his resignation date of January 29, 2018. *Id.* at ¶ 31. USSA's chief human resources officer also sent Miranda a release form and told Miranda that if he signed the release, USSA would pay the severance payments under the Employment Agreement. *Id.* at ¶ 32. However, the release only provided for $275,000 in severance, which was less than what Miranda had calculated his severance to be worth. *Id.* Miranda believed he was owed $394,058 in severance. *Id.*

Days after Miranda received USSA's chief human resources officer's communications, Miranda learned that USSA had initiated suit against Miranda in Georgia state court. Miranda Decl. at ¶ 33. Miranda "interpreted that as yet another bad-faith act of aggression and determined that USSA had no interest in discussing [his] separation from the company in good faith." *Id.* Miranda contacted his lawyer and did not respond to USSA's chief human resources officer's communications. Moreover, Miranda's final paycheck from USSA included payment up to January 19, 2018, not January 29, 2019, which was Miranda's noticed resignation date. *Id.* at ¶ 35.

### B. Procedural History

On or about January 20, 2018, USSA filed suit against Miranda in Georgia state court. Opp. at 5. On March 16, 2018, Miranda removed the case to the Northern District of Georgia. *U.S. Security Assocs., Inc. v. Miranda*, No. 18-CV-01130-JFK, ECF No. 1. On July 13, 2018, a judge dismissed the Georgia action, finding that USSA "unfairly took advantage of [Miranda] and engaged in forum-shopping by filing [an] anticipatory declaratory judgment action . . . during the time that a settlement offer was outstanding to resolve the dispute without such litigation. *Id.*, ECF No. 23.

On February 2, 2018, Plaintiffs filed a complaint in the Northern District of California.

1   ECF No. 1 ("Compl."). On April 27, 2018, USSA filed a motion to dismiss, or in the alternative,

2   to transfer. ECF No. 22. However, the Court never ruled upon the motion to dismiss because on

3   July 19, 2018, the Court granted the parties' stipulation to withdraw the motion to dismiss. ECF

4   No. 42.

5       On March 7, 2019, USSA filed the instant motion for summary judgment. ECF No. 68

6   ("Mot."). On March 21, 2019, Plaintiffs filed an opposition. ECF No. 69 ("Opp."). On March 28,

7   2019, USSA filed a reply. ECF No. 75 ("Reply").

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that

there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of

the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material

fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those

portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets

its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or

discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to

judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most

favorable to the nonmoving party: if evidence produced by the moving party conflicts with

evidence produced by the nonmoving party, the judge must assume the truth of the evidence set

forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152,

1158 (9th Cir. 1999).

## III.   DISCUSSION

Plaintiffs state 5 causes of action: (1) nonpayment of wages under Cal. Lab. Code §§ 200 *et seq.*, 2927 by Miranda against USSA; (2) breach of the Employment Agreement by Miranda against USSA; (3) breach of the Asset Purchase Agreement ("APA") by both Plaintiffs against USSA; (4) breach of the covenant of good faith and fair dealing by both Plaintiffs against USSA; and (5) open book account by both Plaintiffs against USSA. The Court addresses each cause of action below.

### A. Counts 3 (Breach of the APA) and 5 (Open Book Account)

Plaintiffs allege breach of the APA (Count 3) and an open book account (Count 5). The Court addresses these Counts together because Plaintiffs base these two Counts on the contention that the $500,000 EBITDA target was met, an earn-out payment was due, and the failure to make the earn-out payment was a breach of the APA (Count 3). In turn, the alleged breach of the APA by failing to make the earn-out payment forms the basis for Miranda's claim for open book account (Count 5).

The Court first determines which state's laws to apply to the APA and the Employment Agreement. Then, the Court discusses whether the APA is ambiguous such that the Court can consider parol evidence in interpreting the APA. Third, the Court discusses whether it can grant summary judgment on Counts 3 and 5.

#### 1. Which State's Law Governs

The APA contains a choice of law provision that states that Delaware law controls the interpretation and construction of the APA. APA at 11 ("The interpretation and construction of this [Asset Purchase] Agreement, and all matters relating hereto, shall be governed by the internal laws of the State of Delaware."). In fact, the parties are in agreement that Delaware law governs the APA. *See* Mot. at 12 ("Delaware law applies . . . ."); Opp. at 6 ("Delaware law controls the interpretation of the APA."). Indeed, to determine the "enforceability of a choice of law provision in a diversity action, a federal court applies the choice of law rules of the forum state, in this case California." *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009). "Such choice of law provisions are usually respected by California courts." *Nedlloyd Lines B.V. v. Superior Court*, 3

United States District Court
Northern District of California

Cal. 4th 459, 464 (1992). Thus, the Court will apply Delaware law to the APA.

By contrast, the Employment Agreement contains a choice of law provision stating that California law applies to the construction and enforcement of the Employment Agreement. Employment Agreement at 8. The parties are also in agreement that California Law governs the Employment Agreement. Mot. at 22 (asserting that California law governs the Employment Agreement); Opp. at 16 ("California law governs the Employment Agreement."). Thus, in recognition of California law's general enforcement of choice of law provisions, *Nedlloyd Lines B.V.*, 3 Cal. 4th at 464, the Court will apply California Law to the Employment Agreement.

### 2. Whether the APA is Ambiguous

The APA defines the meaning of EBITDA as "earnings before interest, taxes, depreciation and amortization, *determined in accordance with Buyer's historical reporting policies*." APA at 1 (emphasis added). The buyer referred to in the definition of EBITDA is USSA.

The parties differ in their construction of what the "Buyer's historical reporting policies" are. USSA asserts that the APA is ambiguous, and that extrinsic evidence shows that the calculation of EBITDA "is to be performed by using Miranda's historic salary as a proxy for actual corporate overhead (as the Parties agreed)." Mot. at 14. Plaintiffs assert that there is no ambiguity in the APA, and that the USSA already had an established system of "historical reporting policies." Opp. at 7. Specifically, each "month, USSA's accounting department circulates an internal profit-and-loss report for each of its constituent branches, which includes a bottom-line calculation of the historical EBITDA for that branch." *Id.*

Under Delaware law, a "contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* "Ambiguity does not exist where a court can determine the meaning of a contract without any

1  other guide than a knowledge of the simple facts on which, from the nature of language in general,

2  its meaning depends." *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008).

3       The Court finds that the definition of EBITDA in the APA is ambiguous—in particular, the

4  portion regarding the historical policy of the buyer—because it requires the Court to look beyond

5  "the nature of language in general." *Id.* A reasonable person in the position of the parties would

6  need additional, extrinsic evidence to understand the historical policies of the buyer in calculating

7  EBITDA, for no such evidence of what constitutes the historical policies of the buyer appears

8  within the four corners of the APA.

9       The instant case is similar to the situation in *Pedrick v. Roten*, 70 F. Supp. 638 (D. Del.

10  2014). TIAA-CREF Individual and Institutional Services LLC ("TIAA-CREF") maintained an

11  annuity account for decedent Nancy Pedrick. *Id.* at 641. Prior to her death, Nancy Pedrick

12  attempted to change the beneficiary of the annuity account, but TIAA-CREF did not implement

13  the change. *Id.* The *Pedrick* plaintiff sought to effectuate the decedent's amended beneficiary

14  designation, even though it was rejected by TIAA-CREF. *Id.* at 646. Plaintiff argued that TIAA-

15  CREF breached the annuity contract by improperly rejecting the amended beneficiary designation

16  the decedent completed before her death. *Id.* TIAA-CREF's contract with the decedent provided

17  that the decedent had the right to change the beneficiary of the annuity account "by written notice

18  satisfactory to TIAA." *Id.* In analyzing this provision of TIAA-CREF's contract, the *Pedrick* court

19  applied Delaware law and found that the phrase "satisfactory to TIAA" in the context of "written

20  notice" was ambiguous. *Id.* at 468. The *Pedrick* court noted that it "is not clear whether

21  'satisfactory to TIAA' means 'written notice [in a form] satisfactory to TIAA' or 'written notice

22  [substantially] satisfactory to TIAA." *Id.*

23       Here, the APA contains no information as to the USSA's historical reporting policies,

24  much like how in *Pedrick*, "satisfactory to TIAA" was found to be ambiguous because "construing

25  the provision raises the question of *what* must be satisfactory to TIAA-CREF." *Id.* The APA lacks

26  contractually-provided guidance as to USSA's historical reporting policies, thereby preventing a

27  reasonable person in the position of the parties from understanding, simply by reading the APA,

28

8

*what* were USSA's historical reporting policies. In *Pedrick*, the contract provided no guidance as to what would satisfy TIAA-CREF's requirements to amend the beneficiary designation. A reasonable person in the *Pedrick* plaintiff's shoes would need to look beyond the contract to understand what constitutes satisfactory written notice to change the beneficiary of the annuity account.

The instant case is also similar to the situation in *Vanguard Grp., LLC v. Richards*, 2004 WL 3052382 (Del. Ch. Nov. 29, 2004). In *Vanguard*, the plaintiff entered a contract to purchase a parcel of land from defendants. *Id.* at *1. The land was described as "at least 39 acres, to be determined by a survey." *Id.* However, a land survey indicated that the parcel of land sold to the plaintiff was just over 32 acres, not the 39 acres as promised in the contract. *Id.* at *2. The Delaware Chancery Court found that the "contract is not sufficient to identify the portion of the property to be conveyed. The contract itself is facially ambiguous as to whether approximately 39 acres or at least 39 acres were to be conveyed." *Id.* Much like in the instant case where the USSA's historical reporting policies does not have a fixed definition anywhere in the APA, the *Vanguard* contract's description of what land was to be conveyed to plaintiff was ambiguous because the text of the *Vanguard* contract failed to adequately identify the parcel of land being sold.

Thus, the Court finds that the APA is ambiguous. Next, the Court discusses the parties' interpretations of the APA.

### 3. Interpretations of the APA

Delaware law holds that "if the agreement is ambiguous on its face, the trial court may consider parol evidence to clarify the ambiguity." *Salamone v. Gorman*, 106 A.3d 354, 371 (Del. 2014). Above, this Court found the APA to contain ambiguity. Thus, this Court will consider parol evidence to interpret the APA, and in particular, the provision of the APA defining the calculation of EBITDA.

USSA argues that the EBITDA was to be calculated using a "normalized" profit and loss statement that mimicked how Miranda calculated EBITDA for Landmark before Landmark was

acquired by USSA, but USSA substituted Miranda's historical salary as a proxy for actual corporate overhead. Mot. at 14. Plaintiffs claim that branch 224's (Landmark) EBITDA was to be calculated from monthly profit and loss reports ("P&L Reports") issued by USSA's accounting department for each branch. Opp. at 7. The Court first addresses how USSA interpreted "Buyer's historical reporting policies," then addresses Plaintiffs' interpretation.

      a.   USSA's Interpretation of "Buyer's Historical Reporting Policies"

As aforementioned, the APA requires calculating branch 224's EBITDA in accordance with USSA's *historical* reporting policies. However, according to the deposition testimony of John Harford, chief development officer at USSA, and Scott Schrack, director of finance at USSA, USSA could not determine with any amount of certainty how to calculate branch 224's EBITDA under the APA. Specifically, there is a fair amount of confusion as to what constitutes the "buyer's historical reporting policies." The Court first discusses Harford's testimony, then Schrack's testimony.

      i.   Harford's Testimony

John Harford, chief development officer at USSA, testified at his deposition regarding how USSA decided to calculate branch 224's EBITDA. Harford stated that the agreement was to calculate EBITDA according to the seller's historical reporting practices:

> [T]he agreement orally, very clearly, was that we were going to develop a normalized [profit and loss statement] that most closely resembled, as close as possible, the manner in which Dan [Miranda] had accounted for his business. And in short, we were going to take a snapshot of what his business looked like, and then, at that one-year mark, two-year mark, whatever that earnout true-up period would be, we would do several things. We would, one, take out all the nonrecurring owner cost. And that's how we arrived at the business making roughly $500,000 a year, taking out the nonrecurring owner costs.
>
> But included in that financial performance was a compensation amount that Dan [Miranda] was paying himself at the time, which was $125,000. And we agreed that, in the earnout comparison period, that regardless of what he earned as an employee with us, that we would only burden that [profit and loss statement] with the same $125,000 that he was paying himself, and that we would also use his fringe rates rather than our own so as to not penalize or distort the financial performance.

10

ECF No. 68-2, Ex. 1 (Harford Dep.) at 68:9-69:4. Harford testified that under the APA, to calculate branch 224's EBITDA, USSA intended to rely upon a "normalized" profit and loss statement that would mimic how Miranda accounted for his business while Miranda was still in charge of Landmark. *Id.* Thus, USSA intended to rely on the historical reporting practices of the seller, Landmark and Miranda, instead of the buyer, USSA, contrary to the language of the APA.

USSA then burdened this profit and loss statement with the $125,000 Miranda was paying himself when Miranda owned Landmark in lieu of burdening the normalized profit and loss statement with USSA's corporate overhead. *Id.* at 73:11-13. This was not a historical reporting policy of Landmark or Miranda.

Harford later contradicted his own deposition testimony. Harford testified that USSA's profit and loss statement should be used to calculate branch 224's EBITDA:

> Q. [Y]ou would agree with me that the language that's [in the APA] . . . indicates that EBITDA is to be calculated in accordance with [monthly] profit and loss statements such as the one you're looking at right now. Is that right? . . .
>
> A. That is correct.

ECF No. 70, Ex. 1 (Harford Dep.) at 107:24-108:6. Harford also testified that it was his intent that "USSA would be using profit and loss statements in order to calculate EBITDA for purposes of earnout." *Id.* at 75:5-8. Thus, Harford admitted that under the APA, EBITDA was to be calculated in accordance with the *monthly* profit and loss statements issued to each branch of USSA, not the normalized profit and loss statement burdened with Miranda's historical $125,000 salary. *Id.* at 107:7-15. Indeed, Harford conceded that "[m]y understanding [of the deal] and what's memorialized [in the APA] are two different things." *Id.* at 110:10-11.

Adding to the confusion surrounding USSA's EBITDA calculation, an internal accounting memorandum by USSA stated that the EBITDA calculation was to be done "in accordance with the *seller's* historical expense model." ECF No. 70, Ex. 14 at 2 (emphasis added). This accounting memorandum is dated January 23, 2017, *id.* at 1, which is after the APA and Employment Agreement were executed and while Miranda was an employee at USSA, Miranda Decl. at ¶ 17.

Using the seller's historical expense model contradicts the APA, which requires usage of the buyer's historical reporting policies. USSA's accounting memorandum is also at odds with USSA's position during contract negotiations, at which time USSA rejected Miranda's suggestion that the parties use "Landmark's cost structure to measure EBITDA." *Id.* at ¶ 11.

### ii. Schrack's Testimony

The testimony of Scott Schrack, director of finance at USSA and USSA's Rule 30(b)(6) witness, sheds little light on how USSA interpreted its "historical reporting policies." Schrack testified that USSA's historical reporting policy is USSA's issuance of annual audited financial statements. ECF No. 68-2, Ex. 3 (Schrack Dep.) at 61:5-11 ("Q. The term 'buyer's historical reporting policies,' that's not a term that has any generally accepting meaning with USSA, does it? A. I would say no. Other than how we would report our annual audited financial statements . . . ."). However, Schrack testified that these financial statements are only companywide:

> Q. Okay. But the annual audited financial statements, that's companywide?
>
> A. That is correct.
>
> Q. Those are not at a branch level?
>
> A. That is correct
>
> Q. USSA doesn't regularly report audited financial statements for individual branches, does it?
>
> A. We are not audited at that level.

*Id.* at 61:5-20. Thus, according to Schrack, USSA's historical reporting practice was to prepare a company-wide annual audited financial statement *at the company level*, not the *branch level*. *Id.* Schrack also testified:

> Q. [W]ould it be fair to say you consider the term 'buyer's historical reporting policies' to be ambiguous?
>
> A. Without having historical reporting policies defined, I would not know how to define it.
>
> Q. So is the answer to my question it is ambiguous?
>
> A. I would say yes. Yes, sir.

United States District Court
Northern District of California

*Id.* at 54:20-24. Therefore, even Schrack, the USSA employee tasked with calculating branch

224's EBITDA, ECF No. 68-5, ("Schrack Decl.") at ¶¶ 19-20, did not know how to calculate

branch 224's EBITDA under the terms of the APA.

Schrack confessed that he failed to even review the APA before attempting to calculating

branch 224's EBITDA, and that he simply followed instructions from another USSA employee in

deducting Miranda's historic $125,000 salary from the earn-out EBITDA calculation. ECF No. 70,

Ex. 11 (Schrack Dep.) at 70:18-71:13.

In fact, Schrack even admitted that USSA does not usually produce a "document [Schrack]

would look to if [Schrack] wanted to know the historical EBITDA for a branch." ECF No. 70, Ex.

11 (Schrack Dep.) at 35:19-22. Nonetheless, Schrack, for the purpose of calculating branch 224's

EBITDA, implemented the ad hoc method of calculating the EBITDA that Harford described

above, which used Miranda's historical salary as a proxy for corporate overhead. Schrack Decl. at

¶¶ 17, 19.

Using the calculation method to which Harford testified in his deposition, on the first

anniversary of Landmark's sale to USSA, Schrack calculated that branch 224 did not meet the

EBITDA target of $500,000. Mot. at 15. Schrack calculated branch 224's EBITDA to be

$384,599. ECF No. 70, Ex. 6. Moreover, USSA relies upon numerous permutations of the

calculation Schrack completed as evidence of how branch 224 failed to meet its EBITDA target.

*Id.* Schrack performed "different potential calculations using the actual revenues, and then

different combinations of actual expense, historical expenses experienced by Landmark prior to

the sale, or expenses as a percent of gross revenue calculated by using the same percentage such

experiences represented in Landmark's prior business." *Id*. at 15. None of Schrack's calculations

resulted in branch 224 meeting the $500,000 EBITDA target.

Specifically, one of the permutations Schrack attempted was adding in "the actual

corporate overhead and indirect expenses" as opposed to using Miranda's historic salary as a

proxy for corporate overhead and indirect expenses. Mot. at 15. Schrack calculated the actual

corporate overhead and indirect expenses incurred by USSA as a whole to be 3.4% of revenue. *Id.*

United States District Court
Northern District of California

Schrack then deducted branch 224's pro rata share of the corporate overhead and indirect expenses, but the result was that the EBITDA target was not met. Schrack Decl. at ¶25.

However, Schrack's methodology contradicted USSA practices, which do not produce at a branch level "a [profit and loss statement] with corporate and indirect overhead applied to that branch." ECF No. 68-2, Ex. 3 (Schrack Dep.) at 39:9-16. Plaintiffs note that deducting actual corporate overhead "begs the question by presuming that the APA requires *any* corporate overhead deduction at all, as opposed to simply pegging the Landmark branch's EBITDA" to the monthly P&L statements prepared by USSA's accounting department in the ordinary course of USSA's business. Opp. at 14.

In fact, USSA's 2017 EBITDA calculations contained no mention of deducting corporate overhead. ECF No. 70, Ex. 6 at 1-2. Likewise, at no point during negotiations between the parties over whether the earn-out payment was due "did USSA ever say or indicate that the deductions it made to Landmark's EBITDA were justified by the need to account for corporate overhead, either directly or by proxy." Miranda Decl. at ¶ 29. Therefore, it is odd that during litigation, Defendant claims for the first time that the parties agreed to use Miranda's historical salary earned at Landmark as a proxy for corporate overhead. Before litigation, there was no mention that Miranda's salary would be used as a proxy for corporate overhead. Moreover, it is unusual to deduct Miranda's salary from USSA's 2017 EBITDA calculations for branch 224 because USSA did not pay Miranda any salary in 2017. Jed Greene, Plaintiffs' accounting expert, stated that he is familiar with "the set of accounting standards known as Generally Accepting Accounting Principles ("GAAP")," and opined that "a financial statement that included a deduction for a cost item that was not actually incurred, such as a wage amount that was not paid or incurred, would not be in accordance with GAAP." ECF No. 69-3 (Greene Decl.) at ¶ 4.

At bottom, Harford and Schrack's testimony established that USSA's eventual understanding of the APA and the method of calculating branch 224's EBITDA was to generate normalized profit and loss statements that included Miranda's historical salary in lieu of USSA's corporate overhead.

14

Plaintiffs disagree with the premise that branch 224's EBITDA was determined under the APA by the method to which Harford testified in Harford's deposition. Instead, Plaintiffs argue that USSA's monthly P&L Reports constituted USSA's historical reporting policy for each branch of the company. Opp. at 10.

From Miranda's conversations with Harford, Miranda understood that "USSA had an internal system for tracking the performance of its individual branches, and that Landmark would become one of those branches after the acquisition." *Id.* at ¶ 11. Miranda's expectation was that "the same internal metrics that USSA used to track its own branches would also be used to track Landmark's EBITDA." *Id.* Indeed, as aforementioned, when Miranda first started working at USSA, he "contacted the [USSA] accounting department to find out how [he] could track Landmark's performance so [he] would know whether [he] would receive an earn-out payment." Miranda Decl. at ¶ 20. Miranda learned from USSA's accounting department that he could obtain P&L Reports, which "included a bottom-line calculation of EBITDA for each branch." *Id.* Miranda then acquired login credentials that would allow him to keep track of monthly profit and loss reports for all of USSA branches. *Id.* at ¶ 21. Miranda also discovered that the P&L Reports were prepared for every USSA branch on a monthly basis, *id.*, meaning that it was USSA's historical practice to issue these P&L Reports that contained a bottom-line calculation of EBITDA for each branch on a monthly basis.

USSA agrees that these monthly P&L Reports are reliable. Schrack testified that the monthly P&L Report "is the only branch level document distributed to branch managers to provide them with information regarding the financial performance of their branches." ECF No. 70, Ex. 11 (Schrack Dep.) at 58:20-59:5. John Muldoon, also a USSA employee, testified that he looks at branch-level EBITDA "[m]onthly when the [P&L Reports] come out." ECF No. 70, Ex. 13 (Muldoon Dep.) at 119:19-21. Moreover, even Harford testified that these P&L Reports are relied upon when preparing documents for USSA's board of directors, and Harford assumes that the P&L Reports "prepared by the finance department are accurate." ECF No. 70, Ex. 1 (Harford

Dep.) at 34:3-11. In addition, Harford testified that it was his intent that "USSA would be using profit and loss statements in order to calculate EBITDA for purposes of earnout." *Id.* at 75:5-8. However, Schrack also testified that using the P&L Reports to calculate branch 224's EBITDA does not comply with USSA's policies because the P&L Reports do not include "corporate and indirect overhead that is required to operate the business." ECF No. 68-2, Ex. 3 (Schrack Dep.) at 132:13-21.

In September 2017, Miranda requested a first-year P&L Report for branch 224. ECF No. 69-1 (Miranda Decl.) at ¶ 25. The first-year P&L Report disclosed that branch 224 had passed the $500,000 EBITDA threshold to qualify Miranda for an earn-out payment. *Id.* In September 2017, Miranda sent Harford the first-year P&L Report and informed Harford that the earn-out payment for the first year had been earned. *Id.* at ¶ 26. However, Harford never contested Miranda's use of the P&L Report as the basis for Miranda's earn-out. *Id.* Rather, Harford replied that he would check the numbers with the accounting department and then respond to Miranda. *Id.* Miranda received no other communication from Harford on the topic. *Id.* It is curious that Harford never followed up with Miranda because if Harford believed it was wrong to rely on the P&L Report to calculate the EBITDA target, Harford presumably would have immediately responded to Miranda to correct Miranda's error.

Instead, Miranda did not receive any other communication from USSA regarding the earn-out payment until October 16, 2017. Miranda Decl. at ¶ 27. On October 16, 2017, Miranda received an email from USSA's general counsel informing Miranda that USSA calculated Landmark's first-year EBITDA to be $384,599, falling far short of the $500,000 required for an earn-out payment. *Id.* at ¶ 27. USSA's general counsel also attached a spreadsheet to the email showing how USSA calculated the EBITDA. *Id.* at ¶ 28. Miranda reviewed the spreadsheet and "discovered that USSA had applied a number of deductions from the branch 224 EBITDA that branch 224 had not actually incurred. These included small expenses such as 'office supplies,' 'utilities,' and 'postage and delivery,' which had not actually been incurred. *Id.* Miranda also noted a deduction of $125,000 for "owner salary" despite the fact that Miranda was no longer the

16

owner of Landmark and did not draw a salary from Landmark. *Id.* Between October 2017 and January 2018, Miranda's attorney attempted to have USSA cure its apparent breach of the APA to no avail. *Id.* at ¶ 29.

USSA points out that at the time the APA was signed, Miranda was not aware that branch-level P&L Reports were generated, nor could Miranda state what USSA's historical reporting policies were. Mot. at 14 (citing ECF No. 68-2, Ex. 2 (Miranda Dep.) at 140:19-144:1). USSA, however, misrepresents Miranda's state of mind at the time the APA was signed. Though Miranda may not have known the *exact* details of how USSA was going to calculate the EBITDA—much like how various USSA employees did not know what it meant to apply USSA's historical reporting policies to the EBITDA calculation—Miranda expected that the EBITDA calculation "would be done in a formal standard fashion, not some exceptional retroactive revised fashion." ECF No. 68-2, Ex. 2 (Miranda Dep.) at 142:12-14.

Moreover, it does not follow that Miranda's lack of knowledge of the P&L Reports means that USSA prevails. Under Delaware law, "[w]hen construing ambiguous contractual provisions, Delaware courts are permitted to consider the parties' course of dealing." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016). As discussed above, Miranda's course of dealing with USSA involved contacting USSA's accounting department after his employment with USSA began to ascertain how Miranda could keep track of branch 224's performance for earn-out payment purposes. ECF No. 69-1 (Miranda Decl.) at ¶ 20. USSA's accounting department subsequently gave Miranda access to branch 224's monthly P&L Reports. *Id.* at ¶ 20-21. Therefore, USSA's monthly branch P&L Reports are not only part of the parties' course of dealing, but also are part of USSA's ordinary course of business and not an after-the-fact calculation created in the context of a payment dispute.

### 4. Summary

In sum, USSA's witnesses—Harford and Schrack—offered at times contradictory deposition testimony. Nonetheless, Harford and Schrack's testimony alleges that USSA believed that the calculation of branch 224's 2017 EBITDA involved giving Miranda "confidence that we

17

had an apples-to-apples comparison as we looked at out-year performance relative to how [Miranda] managed the business from an accounting standpoint" prior to Landmark's sale. ECF No. 68-2, Ex. 1 at 67:20-24. So, despite the APA's language requiring the EBITDA to be calculated in accordance with USSA's historical reporting policies, USSA asserts it calculated the 2017 EBITDA according to Landmark's historical reporting policies. In allegedly following Landmark's historical reporting policies, USSA applied a $125,000 deduction to branch 224's 2017 EBITDA in lieu of business overhead. However, USSA, Landmark, and Miranda's historical reporting policies did not deduct Miranda's salary in lieu of business overhead. Moreover, USSA's deduction of Miranda's salary in 2017 is unusual because Miranda's salary was not paid in 2017. Jed Greene, Plaintiffs' accounting expert, opined that "a financial statement that included a deduction for a cost item that was not actually incurred, such as a wage amount that was not paid or incurred, would not be in accordance with GAAP." ECF No. 69-3 (Greene Decl.) at ¶ 4.

On the other hand, Plaintiffs have demonstrated that the monthly P&L Reports generated for each branch: are reliable; include a calculation of EBITDA; are the only branch level document provided to branch managers to track their branch's financial performance; and are even relied upon to prepare documents for the USSA board of directors. However, Schrack attacks Plaintiffs' reliance on the monthly P&L Reports to calculate branch 224's 2017 EBITDA because Schrack testified that it was USSA's policy to include "corporate and indirect overhead that is required to operate the business," and the monthly P&L Reports do not include this information. ECF No. 68-2, Ex. 3 (Schrack Dep.) at 132:13-21; Mot. at 16.

Thus, deciding the question of how to correctly calculate branch 224's 2017 EBITDA pursuant to the terms of the APA requires a determination of whether USSA's witnesses were credible in their understanding of the APA terms as compared to Miranda's understanding of the APA. Under Ninth Circuit law, witness credibility is "a determination that is exclusively within the province of the factfinder at trial, not the district court on summary judgment." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035-36 (9th Cir. 2005).

Therefore, upon reviewing the evidence, the Court concludes that there is a genuine

18

dispute of material fact as to how to calculate the 2017 EBITDA for branch 224. There is conflicting testimony, even amongst USSA employees, as to USSA's historical reporting policies. There is some extrinsic evidence that supports each party's contentions, which means that summary judgment here should be denied. *See, e.g.*, *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913 (9th Cir. 2010) ("Because the agreement's language is ambiguous and some extrinsic evidence supports each party's reading, the district court erred by granting summary judgment . . . ."); *Jackson v. AdForce, LLC*, 60 Fed. App'x 133, 135 (9th Cir. 2003) ("Summary judgment should be entered only if the pertinent provisions of the contractual documents are unambiguous; it is the lack of ambiguity within the express terms of the contract that forecloses any genuine issues of material fact."); *Cignex Datamatics, Inc. v. Lam Res. Corp.*, 2019 WL 927352, at *2 (D. Del. Feb. 26, 2019) ("When provisions of a contract are ambiguous, factual issues requiring consideration of extrinsic evidence to determine the intended meaning of the provision in light of the expectations of the contracting parties preclude summary judgment." (internal quotation marks omitted)); *Standard Chlorine of Del., Inc. v. Sinibaldi*, 1994 WL 830145, at *4 (D. Del. Dec. 8, 1994) ("Because the relevant portions [of the contract] are ambiguous, the court must leave their interpretation to the finder of fact."); *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 784 (Del. 2012) ("[I]n a dispute over the proper interpretation of a contract, summary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation.").

Count 3 of Plaintiffs' complaint alleges breach of the APA. Compl. at ¶¶ 35-40. Specifically, Plaintiffs allege that "USSA has materially breached the Asset Purchase Agreement by refusing to pay the 2017 Earn-Out Payment to Miranda and Landmark, despite knowing and information showing that the EBITDA for 2017 exceeded $500,000." *Id.* at ¶ 39. As aforementioned, there is a genuine issue of material fact as to whether branch 224's EBITDA met the threshold for an earn-out payment because the method of calculating the EBITDA cannot be resolved on summary judgment. Thus, the Court DENIES summary judgment as to Count 3— breach of the APA.

Count 5 of Plaintiffs' complaint alleges an open book account. *Id.* at ¶¶ 49-53.

Specifically, Plaintiff alleges that "USSA has failed to pay Miranda and Landmark their Earn-out

Payment for 2017." *Id.* at ¶ 52. As discussed above, there is a genuine dispute of material fact as to

whether branch 224's EBITDA met the threshold for an earn-out payment. Thus, the Court

DENIES summary judgment as to Count 5—open book account.

**B. Counts 1 (Nonpayment of Wages) and 2 (Breach of Employment Agreement)**

Miranda asserts that USSA has failed to properly pay wages under Cal. Lab. Code §§ 200

*et seq.*, 2927 (Count 1). In particular, Plaintiffs allege that USSA has failed to pay the earn-out

payment and Miranda's severance payment. Compl. at ¶¶ 20-27. Furthermore, Miranda asserts

that USSA has breached the Employment Agreement (Count 2) by failing to pay Miranda his

severance payment. *Id.* at ¶¶ 28-34. Only Miranda, and not Landmark, asserts these two claims.

Under the terms of the Employment Agreement, Miranda may resign for "Good Reason,"

which is defined as a material breach of the Employment Agreement. Employment Agreement at

2. Material breach is further defined as, *inter alia*, USSA's failure "to pay any compensation to

Executive in accordance with the terms of this [Employment] Agreement or the Landmark Asset

Purchase Agreement." *Id.* The Employment Agreement also provides that if Miranda "resigns for

Good Reason, Employee shall receive severance payments." *Id.* at 3. In fact, during negotiations

over the Employment Agreement, Miranda was worried that "USSA intended to purchase

Landmark solely to eliminate a regional competitor, and that once the acquisition was complete,

USSA would fire Miranda and concoct an excuse to deny him his Earn-Out Payments." Miranda

Decl. at ¶ 16.

Moreover, under the terms of the APA, USSA would pay the earn-out payment—if

owed—to "Seller." APA at 4. "Seller" is defined as Landmark in the APA. *Id.* at 1.

USSA argues that Counts 1 and 2 should be dismissed because Miranda did not resign for

good reason as a matter of law. Mot. at 20. In particular, USSA argues that under the APA, any

earn-out payment was owed to *Landmark*, not Miranda. Thus, Miranda could not have resigned

for good reason under the Employment Agreement if USSA failed to pay the earn-out payment

because the earn-out payment was never payable to Miranda. *Id.*

First, the Court discusses the earn-out payment USSA failed to pay. Then, the Court discusses the severance payment to which Miranda was entitled if Miranda had quit for good reason. Third, the Court discusses waiting time penalties under Cal. Lab. Code § 203. Lastly, the Court summarizes its findings.

### 1. The Earn-Out Payment

Here, the earn-out payment under the APA is only owed if branch 224 met its annual $500,000 EBITDA target. APA at 4. Pursuant to USSA's calculations of EBITDA, which indicated that branch 224 did not meet the EBITDA target, USSA never paid the earn-out payment. However, as a preliminary matter, the Court determines to whom the earn-out payment, if owed, would be paid.

Under Delaware law, which governs the APA as discussed above, a "contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chemicals*, 616 A.2d at 1196. "To determine the meaning of doubtful [contract] language, however, the court also may consider objective evidence, including the overt statements and acts of the parties, the business context, the parties' prior dealings, and industry custom." *Julian v. Julian*, 2010 WL 10688192, at *5 (Del. Ch. Mar. 22, 2010) (internal quotation marks omitted). "[I]n this search, courts should consider the parties' course of performance as the most persuasive evidence of the [meaning of the] parties' agreement." *Id.*; *see also In re Mobilactive Media, LLC*, 2013 WL 297950, at *16 n.195 (Del. Ch. Jan. 25, 2013) ("[A]ny course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

The parties' course of conduct suggests that the APA treats Landmark and Miranda interchangeably. For instance, the APA states that "[s]imultaneous with its execution and delivery of this Agreement, Buyer has paid to Seller an amount equal to $1,375,000.00 . . . ." APA at 4.

21

Even though the APA defined "Seller" as "Landmark Protection, Inc." and Miranda as "Shareholder," APA at 1, USSA paid the $1,375,000 cash purchase price into Miranda's *personal* trust account, not to a Landmark bank account. ECF No. 70, Ex. 18 at 1. Strictly speaking, *Landmark* should have been paid as opposed to Miranda. Yet, the parties' course of dealings here—the "most persuasive evidence of the [meaning of the] parties' agreement," *Julian*, 2010 WL 10688192, at *5—suggests that the APA treats Miranda and Landmark interchangeably. Importantly, the parties do not dispute that by paying Miranda, as opposed to paying Landmark, the cash purchase price was satisfied under the APA.

Here, the earn-out payment under the APA is only owed if branch 224 met its $500,000 EBITDA target. APA at 4. As discussed at length above, there is a genuine issue of material fact as to whether branch 224 met the EBITDA target. Because the earn-out payment is triggered only if the EBITDA target is met, a genuine issue of material fact exists as to whether USSA's failure to pay the earn-out payment to either Miranda or Landmark breached the APA.

### 2. The Severance Payment

According to Miranda's declaration, he resigned "for 'good reason' under . . . the Employment Agreement on the ground that USSA had failed to compensate [Miranda]" by failing to pay Miranda's severance payment. Miranda Decl. at ¶ 30. Under the Employment Agreement, if the "Employee resigns for Good Reason, Employee shall receive severance payments." Employment Agreement at 3.

The Employment Agreement provides that an employee may terminate employment for "'Good Reason,' which for purposes of this [Employment] Agreement will be defined as [USSA's] material breach of this agreement." Employment Agreement at 2. The Employment Agreement defines "material breach" as, *inter alia*, "the failure of [USSA] to pay any compensation to Executive in accordance with the terms of this [Employment] Agreement or the Landmark Asset Purchase Agreement." *Id.* Neither party disputes that Miranda is an "Executive" as referenced in the Employment Agreement. Mot. at 21 n.9; Opp. at 17. It is also undisputed that USSA did not pay the earn-out payment Plaintiffs demanded. Rather, USSA offered Miranda a

reduced severance of just Miranda's base salary conditioned on Miranda's agreement to a broadly-worded release. Miranda Decl. at ¶ 32. Three days later, before Miranda could respond to USSA's offer, USSA sued Miranda in Georgia state court. *Id.* at ¶ 33. Miranda thus concluded that USSA "no longer intended to honor its obligations under the Employment Agreement," so Miranda never responded to USSA's offer or signed the release. *Id.*

Here, Miranda bases his resignation for good reason on the fact that "USSA had failed to compensate [Miranda] as it was required to do under the APA." *Id*. at ¶ 30. Specifically, Miranda believed that because USSA did not pay the earn-out payment, Miranda could terminate his employment with USSA for good reason. However, as discussed above, the Court found that whether USSA had an obligation to pay the earn-out cannot be resolved on summary judgment because a genuine issue of material fact exists as to how to calculate the EBITDA for the purpose of determining whether branch 224's EBITDA met the $500,000 minimum. Thus, whether Miranda's resignation from USSA was for good reason because branch 224 did not earn the earn-out payment is a genuine issue of material fact that cannot be resolved on summary judgment. It also follows that because there is a genuine issue of material fact as to whether Miranda's resignation from USSA was for good reason, there is also a genuine issue of material fact as to whether USSA was obligated to pay the severance payment.

### 3. Waiting Time Penalties

USSA urges the Court to grant partial summary judgment on Miranda's request for waiting time penalties. Under California law, waiting time penalties are only available if an employer "willfully fails to pay" an employee wages upon termination. Cal. Lab. Code § 203. A good faith belief that the employer had a defense based in law, equity, or fact precludes a willfulness finding. *Barnhill v. Robert Saunders & Co.*, 125 Cal. App. 3d 1, 8, (1981). Plaintiffs believe they are owed waiting time penalties because USSA has not paid the severance payment. Opp. at 22. As discussed above, whether USSA is obligated to pay the severance payment depends on whether Miranda quit for good reason, a genuine issue of material fact that cannot be resolved on summary judgment.

23

### 4. Summary

In sum, there is genuine issue of material fact as to which party's EBITDA calculation was correct under the APA and thus whether USSA owed Miranda an earn-out payment. Moreover, because of this genuine issue of material fact, there is also a genuine issue of material fact as to whether Miranda's resignation from USSA was for good reason. As resigning for good reason is a prerequisite to receiving a severance payment, there is a genuine issue of material fact as to whether Miranda was owed a severance payment.

Therefore, the Court DENIES summary judgment as to Count 1, nonpayment of wages; as to Count 2, breach of the Employment Agreement; and as to waiting time penalties.

### C. Count 4—Breach of the Covenant of Good Faith and Fair Dealing

USSA argues that Plaintiffs' breach of the covenant of good faith and fair dealing claim is actually a negligence claim. Mot. at 18. Furthermore, USSA asserts that the breach of the covenant of good faith and fair dealing does not create an affirmative obligation to maximize the earn-out payment. *Id.* at 19.

Plaintiffs argue that USSA grossly mismanaged branch 224 (Landmark) after Landmark was acquired by USSA because USSA "engaged in arbitrary and unreasonable conduct" in managing branch 224. Opp. at 23. "USSA has caused the Acquired Landmark Business to earn substantially less income than it should have, thus depressing the Earn-Out Payment owed to Miranda and Landmark for 2017." Compl. at ¶ 46. Specifically, USSA failed to devote any resources to growing branch 224 or even maintaining existing levels of client services. Miranda Decl. at ¶ 22. USSA spent nothing on marketing, sales, or business development. *Id.* When branch 224's branch manager quit, USSA did not hire a replacement. *Id.* Instead, USSA tasked an on-duty security guard to handle the entire business. *Id.* Moreover, USSA did not enforce branch 224's 90-day termination policy, "thus allowing clients to end service with minimal notice." *Id.* at ¶ 23. USSA failed to transfer Landmark's phone calls to USSA or forward Landmark's website to USSA. *Id.* at ¶ 22. In April 2017, eight out of the thirteen clients that Landmark brought to USSA ended their contracts. *Id.* at ¶ 23. Branch 224's revenues declined by 83%. *Id.*

As a threshold matter, the Court applies Delaware law to the breach of the covenant of good faith and fair dealing claim. According to the complaint, the crux of Plaintiffs' breach of the covenant of good faith and fair dealing claim is that "USSA has unfairly interfered with Landmark's and Miranda's rights to receive the benefit of the Asset Purchase Agreement." Compl. at ¶ 45. As discussed above, the Court applied Delaware law to the APA, which contains a choice of law provision selecting Delaware law. Moreover, the parties are in agreement that Delaware law applies to this claim. *See, e.g.*, Mot. at 19; Opp. at 23. Thus, the Court analyzes this claim under Delaware law.

"All contracts are subject to an implied covenant of good faith and fair dealing." *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998) (citing *Wilgus v. Salt Pond Investment Co.*, 498 A.2d 151, 159 (Del. Ch. 1985). "In order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581-82 (D. Del. 2007); *see also Fitzgerald*, 1998 WL 842316, at *1 (same). The implied covenant is breached "only when the defendant engage[s] in arbitrary or unreasonable conduct which has the effect of preventing the other party from receiving the fruits of the contract." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 701 (Del. Ch. 2004).

Defendant moved for summary judgment on this claim, in part because Defendant believed this claim to be a negligence claim barred by the economic loss rule under Delaware law. Mot. at 18. However, under Delaware law, negligence claims and breach of the covenant of good faith and fair dealing claims can be simultaneously pled in a single action; they are not mutually exclusive. *See, e.g.*, *Calloway v. Green Tree Servicing, LLC*, 599 F. Supp. 2d 543, 544, 546 (D. Del. 2009). Here, Plaintiffs clearly pled a breach of the covenant of good faith and fair dealing claim, not a negligence claim. Aside from attorney argument, Defendant cites no support for the notion that Plaintiffs' breach of the covenant claim is actually a negligence claim.

Defendant also argues that the "Parties considered at length that the Landmark business

might fall off; indeed, that is the entire point of holding back some of the purchase price." Mot. at 19. Defendant also notes that it is illogical to intentionally damage a business USSA paid $1,375,000 to purchase "in order to save just over $200,000 per year in expenses for 3 years to avoid a less attractive target for investors." Reply at 13 (internal quotation marks omitted).

On the other hand, Plaintiffs allege that USSA bought Landmark to eliminate a regional competitor. The foundation of Plaintiffs' claim is an implied obligation that USSA should act in a commercially reasonable manner in managing branch 224. Compl. at ¶ 46. However, "USSA has caused the Acquired Landmark Business to earn substantially less income than it should have, thus depressing the Earn-Out Payment owed to Miranda and Landmark for 2017." *Id.* at ¶ 46. Specifically, USSA failed to devote any resources to growing branch 224 or even maintaining existing levels of client services. Miranda Decl. at ¶ 22. USSA spent nothing on marketing, sales, or business development. *Id.* When branch 224's branch manager quit, USSA did not hire a replacement. *Id.* Instead, USSA tasked an on-duty security guard to handle the entire business. *Id.* Moreover, USSA did not enforce branch 224's 90-day termination policy, "thus allowing clients to end service with minimal notice." *Id.* at ¶ 23. USSA failed to transfer Landmark's phone calls to USSA or forward Landmark's website to USSA. *Id.* at ¶ 22. In April 2017, eight out of the thirteen clients that Landmark brought to USSA ended their contracts. *Id.* at ¶ 23. Branch 224's revenues declined by 83%. *Id.*

*Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451 (Del. Ch. Apr. 20, 2009), is helpful to understanding the arguments here. In *Bay Center*, the plaintiff and the defendant were involved in developing a condominium project. 2009 WL 1124451, at *1. Defendant was empowered to manage most of the aspects of the project. *Id.* at *3. However, the condominium project failed, and the plaintiff blamed the defendant's mismanagement, such as "budget overruns in excess of $10 million, vendor complaints, poor sales, and squatters and vandalism." *Id.* at *1. The *Bay Center* court denied defendant's motion to dismiss the covenant of good faith and fair dealing claim because defendant's alleged mismanagement prevented plaintiff from "receiving the fruits of the bargain." *Id.* at *7.

United States District Court
Northern District of California

Defendants cite two cases to contend that Delaware law does not impose an obligation on a buyer to maximize earn-out payments to sellers. *See Winshall v. Viacom Int'l Inc.*, 76 A.3d 808, 816 (Del. 2013) ("Nothing in the Merger Agreement states, or could be read to imply, that Viacom or Harmonix must conduct their businesses, post-merger, so as to maximize the amount of the Selling Shareholders' earn-out payments."); *Lazard Tech Partners, LLC v. Qunetiq N. Am. Operations LLC*, 114 A.3d 193 (Del. 2015) ("[T]he implied covenant did not inhibit the buyer's conduct unless the buyer acted with the intent to deprive the seller of an earn-out payment."). However, *Winshall* and *Lazard* are inapposite. *Winshall* and *Lazard* are cases that deal with a duty to maximize earn-out payments, whereas here, the issue is whether USSA should have acted in a commercially reasonable manner in running branch 224.

Thus, Plaintiffs have raised a genuine issue of material fact as to whether USSA breached the covenant of good faith and fair dealing. Therefore, the Court DENIES summary judgment as to Count 4, breach of the covenant of good faith and fair dealing.

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES summary judgment as to Count 1 (nonpayment of wages), Count 2 (breach of the Employment Agreement), Count 3 (breach of the Asset Purchase Agreement), Count 4 (breach of the covenant of good faith and fair dealing), and Count 5 (open book account).

**IT IS SO ORDERED.**

Dated: May 2, 2019

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge